# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00686-CV

## In the Interest of S. E. B.

### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT
### NO. A-00-1139-AG, HONORABLE RAE LEIFESTE, JUDGE PRESIDING

S.E.B. was born on April 12, 1997, to Crystal D. Barbero. On September 29, 2000, the Attorney General of Texas filed a petition to determine whether Claude Eugene Bradshaw, III, was S.E.B.=s father. Bradshaw initially denied that he was the father; after DNA testing showed that Bradshaw was the father, he filed an amended answer acknowledging his paternity and asking the district court, among other things, to change S.E.B.=s last name to Bradshaw and to render orders related to child support. Bradshaw asked that retroactive child support be ordered only as of the date paternity was established. The district court signed a final order finding that Bradshaw was S.E.B.=s father, changing S.E.B.=s last name to Bradshaw, and ordering Bradshaw to pay $5,000 in retroactive child support back to September 29, 2000. Barbero appeals, contending that the district court abused its discretion in ordering the name change and in finding that Bradshaw first learned of his probable paternity in September 2000, rather than in September 1996, when he was informed that Barbero was pregnant. We will affirm.

### Summary of the Evidence

Bradshaw testified that in mid-August 1996, he and Barbero had a Aone-night stand.@ Bradshaw saw Barbero about one month later, on about September 12 or 15, and she told him, AWell, I=m two and a half or three and a half months pregnant.@ He further testified, AAnd I had this look on my face like >not good,= and she said: It=s not yours; it=s my old boyfriend=s that I was living with.@ When asked if she told him in September 1996 that either he or her ex-boyfriend, J.D. Williams, could be the father, Bradshaw said, AShe might have said that; I don=t recall that.@ Bradshaw admitted that Barbero did not expressly exclude him as the father altogether. Shortly after S.E.B. was born, Bradshaw saw a photograph and thought that S.E.B. did not resemble him in any way; when he viewed the photograph, he was in a bar with dim lighting. Bradshaw also testified that he went by Barbero=s residence once after S.E.B. was born; S.E.B. was sleeping in a back room, and Barbero refused to let Bradshaw see him.

In 1996, Bradshaw discussed gestation periods with several people because, AI kind of wanted some reassurance, because if it=s possible I had a son out there, I would want to know about it.@ He testified that Barbero told him Aconflicting stories,@ and gave him a due date of March 15. Bradshaw believed that if the date of conception was on or about August 17, Athe due date for that child wouldn=t have been March 15th; it would have been more like the middle of May, in to the first of June, something like that, not March 15th.@

Bradshaw also testified that in early 1999, Barbero=s sister Laura Abernathy told him that S.E.B. resembled him, and in August 1999, Barbero told him that Williams had been excluded as S.E.B.=s father by a DNA test and that Bradshaw must be the father. Bradshaw said:

2

Whenever she called me and told me, I said: Okay. I=ll come by and I=ll see the boy and we=ll talk and we will see what we can work out. And I hung up and I got to thinking. I said: You know, I=ve always wanted a son. I=m not going to get attached to a little kid that I think is probably not mine. So I called her back up and I said: Look, if you got this other guy tested, you=re bound to have some kind of paperwork or proof that he got tested. Send me a copy of that paperwork and I=ll be glad to do something. She wrote down my phone number, my name and address and I never heard a word from her.

When Barbero failed to send him the test results, he did not believe she was telling the truth. He believed he was not the father A[b]ecause it was a one-night stand. She had told me he wasn=t mine. She told me she was two and a half to three and a half months pregnant a month after we were together.@

Bradshaw testified that no one ever approached him to take a paternity test and he did not believe it was his responsibility to contact the Attorney General to arrange for testing. Bradshaw thought it was Barbero=s responsibility to show him Williams was not the father. He said, AIf she thought I was the father, she should have asked for help or she should have made sure I knew that I was the dad.@ Bradshaw testified that if he had known he was the father when S.E.B. was born, he would have sought full custody.

Bradshaw said he did not know Barbero had a case with the Attorney General=s Office until October 2000, when Barbero told him that the Attorney General=s Office was looking for him. He immediately contacted the office and took a paternity test in December 2000. Bradshaw testified that he began paying child support on the day he found out that he was the father, in January 2001. Bradshaw said he knew he was S.E.B.=s father in January 2001, when he got the test results. He thought he probably was the father in October 2000, when he learned of Barbero=s case with the Attorney General.

3

Bradshaw said he wanted S.E.B.=s last name to be Bradshaw. He said Aright now, [S.E.B.] doesn=t know his name in the first place. Most of the time he says it=s Kennemer,[1] and his name is not Kennemer, never has been Kennemer. He should have a normal name like every other kid in the United States and not have a hyphenated last name.@ He objected to S.E.B.=s name remaining Barbero because he feared other children would be cruel and tease him when they found out his father=s name was not Barbero. He also did not want S.E.B.=s name to be hyphenated because then S.E.B. would have to go through life explaining why he had two last names. Bradshaw=s mother testified that S.E.B. says his last name is Kennemer.

Williams=s friend, Melissa Cahill, testified that, while pregnant, Barbero insisted that Williams was the baby=s father. Cahill testified that even after S.E.B. was born, Barbero showed her photographs of S.E.B. and stated that he looked like Williams. She first learned that Bradshaw was the father Aa couple years@ later, when Barbero said, AOh, by the way, J.D.Bmy youngest turned out not to be J.D.=s [Williams], and then she goes >oops.=@

Barbero testified that she had a one-night stand with Bradshaw on August 17, 1996. She found out she was pregnant with S.E.B. on September 7. She said at that time, she was not sure whether the father was Bradshaw or Williams, with whom she last had sexual intercourse in early July before their

---

[1] Barbero is now married to Ronny Kennemer. Although she has not legally changed her name from Barbero to Kennemer, the record shows that she, S.E.B., and her other son sometimes go by the name Barbero-Kennemer.

relationship ended in late July. Barbero testified that she notified Bradshaw of his possible paternity on September 14; she denied telling him that she was already two and a half to three months pregnant. Barbero said she saw Bradshaw frequently during her pregnancy and kept him informed of due dates and other information given to her by her doctor. She testified that she never told Bradshaw that he definitely was not the father or that Williams definitely was. About a week after S.E.B. was born, she spoke to Bradshaw, who asked if the baby had been premature. She informed him S.E.B. was not premature and had been carried for thirty-seven weeks. She testified that she also told Bradshaw that she believed he was the father because the baby had a light complexion and light hair, whereas Williams had very dark hair and a very dark complexion. When S.E.B. was one or two months=old, she showed his photograph to Bradshaw and again told Bradshaw the baby looked just like him; Bradshaw Adidn=t really make much of a response,@ and Ajust kind of shrugged it off.@ When asked about the night Bradshaw came to her residence while S.E.B. was asleep, she claimed that she Aurged him to see him just so that he could look at him and see what a resemblance there was,@ but Bradshaw declined to look at S.E.B.

Barbero testified that on the same day she received written notification that DNA testing excluded Williams as the biological father, she contacted Bradshaw to inform him that he was the father. Bradshaw asked her to send him the information about Williams=s test, but she did not send the requested information because, AI felt that it was his responsibility. I had gone above and beyond@ by notifying him of his paternity and trying to get him to take some interest in S.E.B. Barbero stated that in September or October 2000 she advised Bradshaw that the Attorney General=s Office was looking for him.

**5**

Barbero testified that in 1997 when S.E.B. was born, she believed Bradshaw was the father. She did not name Bradshaw as the father on the birth certificate because she was not positive he was the father, even though she Aassumed, in [her] opinion@ that he was.

In June 1998, Barbero applied for financial assistance with the Attorney General=s Office. In her application, she named Williams as the biological father, said she had Ano idea@ of the date of conception, and said that when she told Williams she was pregnant, he replied, ADo you need money to get rid of it?@ The application asked whether she had a sexual relationship with anyone else during the time frame of S.E.B.=s conception, and she named Bradshaw and listed his partial address and phone number. She signed the form, declaring that Aall information provided in this form is true and correct.@

Barbero testified that she named Williams on the assistance application because she did not know Bradshaw=s information and her caseworker said to Alist the one that you know his information.@ She testified that after a DNA test showed Williams could not be the father, she attempted to re-apply naming Bradshaw as the father, but her application was rejected several times because she Adid not supply them with enough information@ about Bradshaw. She said Williams Awas also actually a possibility. I am not a medical doctor. I have no way of knowing.@ She said, AI thought it was [Bradshaw]. I filled it out on [Williams].@ Although she Aknew more information about J.D. Williams,@ she was able to get Bradshaw=s address and phone number from the telephone book and she left several questions about Williams unanswered on the application, including his address, phone number, driver=s license information, birthplace, and parents= names and addresses.

In March 2000, Barbero filled out a second application naming Bradshaw as S.E.B.=s father; she provided his address, phone number, and a general physical description, but left most of the other questions unanswered. She said she believed Bradshaw was the father because Amy boyfriend at the time failed the DNA test.@

Barbero testified that she has two sons, both of whom go by the last name of Barbero, but said, AWe do hyphenate Kennemer at times.@ Barbero asked the district court to leave S.E.B.=s last name unchanged because Ait=s his name. Everything else in this baby=s life has changed in the past six months, and I don=t think that changing his name B it=s going to confuse him even worse.@ In the alternative, Barbero asked the court to hyphenate S.E.B.=s last name to Barbero-Bradshaw. Records from S.E.B.=s school files show that Barbero registered S.E.B. with the surname of ABarbero-Kennemer@ and also listed the hyphenated name as her last name.

Laura Abernathy, Barbero=s sister, testified that in October or November 1996, Barbero informed her that she was pregnant and that the father was either Williams or Bradshaw. Barbero told Abernathy that Bradshaw claimed to have worn a condom, and that she Aonly slept with him one night.@ After S.E.B. was born, Abernathy asked Bradshaw Aif he had seen his son,@ and Bradshaw replied that S.E.B. was not his child. Abernathy responded that S.E.B. looked like Bradshaw, not Williams, but Bradshaw said he had to have proof before believing he was the father. Abernathy said she once showed him a photograph of S.E.B., and Bradshaw agreed that there was a resemblance but said, ACrystal doesn=t want anything to do with me and there=s no proof that he=s mine.@

Joanie Hughes, Barbero=s cousin, testified that she was present on the evening Bradshaw came to Barbero=s residence while S.E.B. slept in the back room. Hughes said Barbero told Bradshaw that she had Apretty much narrowed down that he was the father and asked him if he would like to go see him, if he wanted to look at the baby, because he was sleeping.@ Bradshaw did not look at S.E.B. Jennifer Weidner, another of Barbero=s cousins, testified that in March 2000, she saw Bradshaw and asked if he knew about Williams=s DNA test. He said that he did, and Weidner asked, ASo you know that you=re [S.E.B.=s] father, and he said yes.@ Weidner said Bradshaw did not seem interested in taking any initiative to confirm whether he was the father.

## Discussion

The district court issued findings of fact and conclusions of law, finding that Bradshaw had knowledge of his paternity on or about September 29, 2000, and concluding that retroactive child support began accruing on that date. The district court also concluded that it was in S.E.B.=s best interest to have his last name changed to Bradshaw. In two issues, Barbero appeals, contending (1) the district court abused its discretion in ordering S.E.B.=s last name changed, and (2) the court erred in finding Bradshaw knew of his probable paternity on September 29, 2000, rather than September 1996 or August 1999.

We review a trial court=s findings of fact under the same standards applied in a review of a jury=s verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We may not focus on the weakest evidence supporting a judgment or choose to believe witnesses that the fact-finder found unpersuasive. *Ortiz*, 917 S.W.2d at 772.

8

A trial court may order a child's name changed if the change is in the child's best interest. Tex. Fam. Code Ann. ' 45.004(a) (West 1996); *G.K. v. K.A.*, 936 S.W.2d 70, 73 (Tex. App.CAustin 1996, writ denied). A parent's interests and desires are of secondary importance. *In re Guthrie*, 45 S.W.3d 719, 724 (Tex. App.CDallas 2001, pet. denied); *In re J.K.*, 922 S.W.2d 220, 222 (Tex. App.CSan Antonio 1996, no writ). A trial court has wide discretion in deciding whether it is in the child's best interest to grant a name change request. *G.K.*, 936 S.W.2d at 73. A trial court abuses its discretion if it acts unreasonably, arbitrarily, or without reference to guiding rules and principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Guthrie*, 45 S.W.3d at 723. Generally, courts will change a child's name reluctantly and only when the child's welfare requires it. *Guthrie*, 45 S.W.3d at 724.

On appeal, Barbero urges that S.E.B.=s surname should remain unchanged because the rest of his family unit has the name Barbero and a name change may confuse him and subject him to humiliation in the future. She also contends that Bradshaw=s Alack of involvement in [S.E.B.=s] life before October 2000 and other misconduct@ should weigh against changing S.E.B.=s name to his father=s name. At trial, Barbero testified that S.E.B. has been named Barbero all his life[2] and that both of her sons currently have the same last name. Bradshaw testified that he believed that the name change was in S.E.B.=s best interest because he feared S.E.B. would be teased if he had a different name than his father and because he did not want his son to have to explain a hyphenated name. He also said that S.E.B. does not have an understanding of his last name; according to Bradshaw and his mother, S.E.B. usually states that his last name is Kennemer, not Barbero. Although Barbero contends that changing S.E.B.=s name will confuse him, she herself has informally changed his name by hyphenating it with her current husband=s name. Records from S.E.B.=s school files show that Barbero has not listed S.E.B.=s name as Barbero, but instead as Barbero-Kennemer.

We cannot hold on this record that the district court abused its discretion in ordering the child=s name change. *See G.K.*, 936 S.W.2d at 73; *see also Guthrie*, 45 S.W.3d at 726 (no abuse of discretion to change name where father reasoned that name change would show child=s family ties and heritage; mother=s wish to keep child=s name the same as hers weighed against name change but did not overwhelm evidence in favor of change); *J.K.*, 922 S.W.2d at 222-23 (abuse of discretion to change child=s

---

[2] S.E.B. was about four and one-quarter years= old at the time of the hearing.

last name from father=s to mother=s name because no evidence that keeping father=s name would harm child; father=s concern about his own social issues is insufficient). We overrule Barbero=s first issue on appeal.

When a trial court makes a determination of parentage, the court may order retroactive child support. Tex. Fam. Code Ann. ' 160.005(b) (West 1996). In ordering a father to pay retroactive support, a trial court should consider the father=s net resources during the relevant time frame and whether the mother had attempted to notify the father of his probable paternity, whether the father knew of his probable paternity, any undue financial hardship that could result from the order, and whether the father provided support or other necessities before the paternity action was filed. *Id.* ' 154.131(b) (West Supp. 2002). A trial court has broad discretion in deciding whether to order retroactive child support and, if so, in what amount. *Guthrie*, 45 S.W.3d at 727; *In re S.E.W.*, 960 S.W.2d 954, 956 (Tex. App.CTexarkana 1998, no pet.).

Bradshaw and Barbero gave substantially conflicting testimony about Barbero=s attempts to notify Bradshaw of his probable paternity and about when Bradshaw knew of his probable paternity. Bradshaw testified that Barbero informed him that he was not the father and that Williams was the child=s father, told him she was two and a half to three and a half months pregnant one month after their sexual encounter, failed to send him the test results showing Williams was not the father, and refused to let him see S.E.B. when he stopped by her residence. Bradshaw asserted that as soon as he learned Barbero had filed a report alleging his paternity, he contacted the Attorney General=s Office. Barbero testified that she told Bradshaw that he might be the father immediately after she learned she was pregnant. She denied telling him that she was further along in her pregnancy than she actually was or that Williams was the father, and said

**11**

Bradshaw refused to look at S.E.B. when he was at her residence. Barbero=s cousins testified that Bradshaw should have suspected he was the father earlier than September 2000, but Cahill testified that during Barbero=s pregnancy and after S.E.B.=s birth, Barbero contended Williams was the father. In the 1998 application filed with the Attorney General, Barbero named Williams as the father and signed her name, declaring that her allegations were true.

We will not second-guess the trial court=s determination of facts based on witness credibility or demeanor. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *Schneider v. Schneider*, 5 S.W.3d 925, 931 (Tex. App.CAustin 1999, no pet.). Based on this evidence, we cannot hold that the district court abused its discretion in finding that Bradshaw knew of his probable paternity on or about September 29, 2000, and concluding that retroactive child support began accruing on that date. We overrule Barbero=s second issue.

We affirm the district court=s order.

_____

Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed

Filed: May 31, 2002

Do Not Publish